IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:23-CR-146 |
| | ) | |
| MARK ALAN BLACK, | ) | Hon. Leonie M. Brinkema |
| | ) | |
| *Defendant*. | ) | Sentencing: April 30, 2024 |
| | ) | |

## <u>UNITED STATES' POSITION WITH RESPECT TO SENTENCING</u>

For more than three years, Defendant Mark Alan Black conspired with other predators to find and sexually exploit vulnerable children online all while maintaining the façade of an attorney for the federal government.  The defendant shared the spoils of his predation with his co-conspirators—namely, videos of children engaged in sexual acts—and provided them the minors' usernames and helpful tips, so co-conspirators could find these child victims and further exploit them. Although there are four identified victims in this case, the defendant and his co-conspirators were recording over 330,000 minors a day, so the number of potential victims is incalculable.

The defendant and his co-conspirators used multiple chatrooms on a social media platform to strategize and carry out their common mission of online sexual exploitation of children.  The chatrooms were dedicated to (i) discussion of their sexual interests in minors, (ii) discussion of how to find minors online and successful tactics to persuade them to make child pornography, and (iii) the exchange of child pornography.  The defendant and his co-conspirators created rules and systems for the chatrooms to ensure that members remained focused on the goal of collecting (mostly live streaming) child pornography and to ensure that

1

their discussions occurred in the correct chatroom (e.g., the "faq" channel was for questions and answers about the purpose of the group and the roles of its members, and the "Talk Stretegy" channel was created for members to plan how to better exploit children). The defendant treated the online enticement of children like a sport—identifying weaknesses in his techniques and encouraging his co-conspirators to share grooming tips for the benefit of all the members.

The defendant has pleaded guilty to conspiracy to produce child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Count 1), and coercion and enticement, in violation of 18 U.S.C. § 2422(b) (Count 7). The applicable guidelines range of 360 months to life imprisonment have been correctly calculated in the Presentence Investigation Report ("PSR"). *See* Docket Entry ("DE") 65. For the reasons that follow, the United States respectfully submits that a sentence of 360 months' imprisonment is sufficient but not greater than necessary, to reflect the seriousness of the crime, the significant harm caused by the defendant's crimes, the risk of recidivism, and to deter the defendant and others who may seek to sexually exploit children online.

## BACKGROUND

### I. The Defendant Conspired with Individuals Sexually Attracted to Children to Produce Child Pornography

From at least January 16, 2018, the defendant was an active member of at least two chatrooms on a social media platform that will hereinafter be referred to as "APPLICATION A," dedicated to the sexual exploitation of minors. PSR ¶ 27. The users in the chatrooms worked together to produce, advertise, distribute, receive, and possess images and videos of minors including prepubescent children, engaging in sexually explicit conduct. *Id*. The chatrooms were broken down into text channels (sub-chatrooms), many of which corresponded to live streaming social media platforms where the users in the chatrooms sexually exploited minor victims. *Id*.

While a member of the chatrooms on APPLICATION A, the defendant utilized at least two usernames to communicate in the chatrooms.  PSR ¶ 28. The defendant's primary username will hereinafter be referred to as "APPLICATION A, USERNAME 1."  *Id*.  The defendant posted both on the text channels of the chatrooms and communicated via direct message with other users on APPLICATION A who were also members of the chatrooms.  *Id*.

The defendant was one of the early members of one of the chatrooms on APPLICATION A.  PSR ¶ 29.  The defendant communicated the goals and purpose of this particular chatroom to the other users.  *Id*.  The members were made aware that the purpose of the group was to work together to locate minor victims on social media platforms, mainly live streaming platforms, where the users could communicate with the minors and get the minors to engage in sexually explicit acts and produce sexually explicit content.  *Id*.  The users were told to capture or record the content and share it amongst the members of the chatroom. *Id*.  For example, on or about January 17, 2019, on the "general-chat" text channel of the chatroom, the defendant made the following posts:

- "Since we've added some folks, it probably bears outlining why we have created yet another server. I'll take a stab at it."[1]

- "The Cooperation [chatroom][2] was established with the goal of uniting boys in search of smoothies[3]. The purpose was to work together to secure these and, as the number of pervs and BMers increased, lead girls to safe, fun spaces with boys they liked and trusted." *Id*.

After the defendant made these two posts, another user stated, "Yes. and as it turned out not everyone was working towards our common goals. Sonwe [sic] are trying over again. same

---

[1] All communications on APPLICATION A are reproduced exactly how they were written.

[2] The Cooperation chatroom was a previous APPLICATION A chatroom the defendant was a member of that had the same goal and purpose as that of the main chatroom on APPLICATION A.

[3] Based on extensive examination of the communications on APPLICATION A, "smoothies" refers to a minor with no pubic hair.

ultimate goal. search and secure smoothies so we all can enjoy, including the smoothies themselves." *Id.* at ¶ 30. The defendant then stated:

- "I wanted to reiterate that sharing and transparency are the goals here." *Id.*

In order to join the chatrooms on APPLICATION A, the users, including the defendant, were invited by invitation links.  PSR ¶ 31.  Once the members of one of the chatrooms joined the group, many of the users introduced themselves on the "reception" text channel by describing the type and age of minors in whom they had a sexual interest.  *Id.*  On July 31, 2019, and November 19, 2019, respectively, the defendant posted the following on the reception text channel:

- "Welcome I'm "no standards just options" ... never under 9, except for my 7 and 8 yo gfs."

- "Back from work and ready for introductions. Globalist, who likes all flavors (chocolate, caramel, lemon, vanilla, and whatever else there is) with a taste for 10-12, but flexible on the lower bound to... welp ... speech and the upper bound to legality." *Id.*

Members of the chatrooms described the roles that the users were expected to take on. PSR ¶ 32.  For example, in the "faq" channel, the following messages were posted to the group by three of the users between on or about January 22, 2019, and between on or about January 24, 2019:

- "FAQ #1: Why? Answer: They don't think it be like it is, but it do."

- "FAQ #2 - *Simple questions to gauge prospective new members*: Hi - we're considering a new server. To make sure it's the right fit for you, can you answer these questions please: **a) Is any nude a win for you or do looks matter? b) Do you generally prefer 8-12 or 13-17? c) Do you know how to cap? d) Do you have a FC/GL accounts? If not, are you willing to create an FC/GL account to swoon girls into capping? e) Do you run a VPN and if so, for how long? f) Are you fluent in English or another language? g) What do you enjoy most - the win (the nakedness), witnessing a girl discover her sexuality, the tease or meat curtains? h) Consider a girl is teasing on a broadcast – her location is open and she just gave her phone number out - you notice a brutal blackmailer in the list of watchers - do you: 1) warn her and block a potential epic win. 2) sit back and say nothing or 3) keep pushing her towards what might be the win of your lifetime **"

- "@everyone Main roles are in captal letters. Sub roles are in lowercase TALKER (sub roles: spotter/capper) *A TALKER is dedicated to get in with the girls by talking. He will need some social media knowledge and the ability to take girls into a private atmosphere and ultimately and as fast as possible into a private broadcasting atmosphere for us all to keep working on her. TALKER primarily targets ids posted by the SPOTTER regardless of his own preferance when it comes to the girls. He may also go for girls he feels might provide the wins. if there are no prospects to work on he supports the spotters or cappers* SPOTTER(sub roles: capper/talker) *Maybe the most versatile role. It is important for a spotter to be able to read a girls body language and personality so he can notify the CAPPER or the TALKER or maybe both in time. He will try to see if a girl is more fit for a private or public win and notify the right role(s). He also considers the preferances of all team member when choosing targets. If no TALKER or CAPPER is available he takes on his sub roles. He will most likely also be the one who gets the longest cap since he spotted the win first. and he will upload that cap in the appropriate room using a predefined format.* CAPPER (sub roles: spotter/talker) *The main task of a CAPPER is to cap and upload any id/broadcast notified by the SPOTTER. Regardless of his own preferances. He will have to have constant access to a computer while active for this purpose. He will make uploads and post on the driproom on this server using a predefined format decided by the group. A small description is required so people know if this is a girk according to their own liking before downloading. Once a cap is started he can support the other roles in talking/spotting where needed*"

- "FAQ #4 - Share post format preferred: ```Filename which includes UserID and RoomID.ts, Size/Length - and maybe a little backstory Filename which includes UserID and RoomID.flv, Size/Length - and maybe a little backstory Filename which includes UserID and RoomID.mp4, Size/Length - maybe a little backstory ArchiveFileName.rar | Size <https://dropmefiles.com/XxXx> | DMFpass | FILEpass```" *Id.*

## II.   The Defendant and his Co-Conspirators Discussed Best Grooming Tactics for Children

In accordance with the rules and goals of the group, the members, including the defendant, worked together to exploit minors to engage in sexually explicit acts and send sexually explicit content of themselves over multiple social media platforms. PSR ¶ 33. The defendant was even impatient for that to occur.  On February 4, 2019, the defendant posted:

- "I still want to go after a girl. I know we have time problems, but we still have yet to say, "She's a target, let's put 5 guys in her, charm her, strip her, and take her out.""

Additionally, on July 24, 2019, the defendant posted that he wanted to improve on his techniques

for sexually exploiting children. Another user wrote, "Someone (I think <@453563604445298688> ) jokingly mentioned a grooming guide on one of the other servers. Can I have this please? Genuine request. I can chat shit for hours, but swerving the conversation is a struggle for me." The defendant then responded, "An area I could improve on. I'm not making the most of my chances."

The defendant and his co-conspirators used advanced technology to manipulate children. For example, on October 29, 2019, the defendant posted:

- "The most epic fake I ever did was [redacted minor name] - I recorded a video I had of my boy and used a voice modifier to play audio while I recorded a video of the screen on another device [redacted minor name] asked did the ultimate proof - video of Jayden saying "I love you [redacted minor name]" She's 10 - it worked 😄"

On April 27, 2021, the defendant posted:

- "I've tried modulators and it ended up sounding like an old lady or super fake. It's easier to play a post-pubescent boys 14 or 15 at least. Some of us are manly men 😄 but yes - i spent too long avoiding voice chat. It builds a good bond."

The defendant and his co-conspirators also worked together on how to successfully exploit children more effectively. On October 12, 2019, the defendant wrote:

- There are multiple approaches to getting girls, and there are different ways to work each approach. Girlfriend/boyfriend is obvious. Some girls are looking for boyfriends and they may not be best for group activities. Or they may find different interests if there just one boy. Attention. A lot of girls want attention and are suited to groups. That's why I had the idea of a group account to host videos from each of our characters (boys and girls ) to lend legitimacy and get girls interested in being a part of something. Unlike musically (where I saw this used very effectively) there aren't private accounts. However, I think the same approach could work. A group of cute boys and girls let girls submit vids to be featured on the group's page. To submit vids, they have to give up social media. And maybe get involved in group chats, etc. Once we have then there, we have a decent chance of requesting or peer pressuring a livestream. A rite of entry. And the characters could say everyone has done it (hence why they don't have to) Basically, once she's in a group we can work her. I would recommend not sorting into a girls only group at the start. Some girls will say they are les, but end up liking boys. I think it's better to set up the big group and then let subgroups form as it progresses. I don't want to lose a girl we got horny because she secretly wanted a boy and some other perv offered that. The alternative to a group

account is to go straight to snap/ insta group. It saves needing profiles. Once we have her on SM, we can work her and play games - which is effective.

### III.     The Defendant and his Co-Conspirators Hacked into Baby Cameras

There was an entire channel on the server dedicated to "IP Cams." This channel was designed to surreptitiously tap into and record content from baby monitors, nanny cameras, or any other internet enabled camera within residences.  *See* Gov. Ex. 1. Users would periodically provide IP addresses to their co-conspirator, who developed his own computer code to hack into these devices.  *See* Gov. Ex. 1. He would then share the live video feeds in the channel and other users would watch and comment on them.  On April 24, 2021, a user stated, "girl in France, sometimes sits in mom's lap panti-less for a bedtime story. she's ~4" and the defendant replied, "Mom always wondering why her husband loves story time." *Id*.

This tactic to exploit children was described as "next level targeting" by the defendant on January 27, 2019:

- Co-conspirator – "found this girl on ipcam, she was browsing tiktok or like on a tablet earlier tonight. i'll have to pay closer attn and see exactly which app it is her name is [MINOR NAME], and i think her last name is [MINOR LAST NAME]"
- Gnomeme#0679 - Can u tell county?
- Co-conspirator - ip lookup says Great Falls, Montana
- Gnomeme#0679 - Next level targeting

The defendant and his co-conspirator discussed the locations of these cameras frequently, their conspiracy able to, at times, discover the exact address of cameras locations.

### IV.     The Defendant and his Co-Conspirators Shared their Successful "Caps" – i.e., Child Sexual Abuse Recordings

After the members successfully captured minors engaged in sexually explicit conduct, they exchanged the content by uploading the files directly to the chatroom or they uploaded the files to third-party file sharing platforms where the users could access the links and download the content.

PSR ¶ 33. On many occasions, the users also shared the ID numbers and usernames associated with minors' live streaming and other online accounts so the users on the chatroom could follow, watch, and record the minors' activity, which often included the minors engaging in sexually explicit activity. *Id.* Below are examples of how users exchanged sexually explicit files of minors, IDs of minors, and usernames of minors in the chatroom. *Id.*

- On July 11, 2019, a user posted a MEGA (third-party file sharing platform) link on the "dl-links" channel. *Id.*

    o The link directed the users to a video file that was 25 minutes and 58 seconds in length. The video depicted a female with a tank top and shorts on. The female can be seen spreading her legs open. She takes her right hand and moves her shorts and underwear over to the right and exposes her pubic area to the camera while counting to ten. She then uses her left hand to move her shorts over, exposing her pubic area to the camera. The female moves her shorts to the left again and rubs her pubic area with her right hand. The female stands up and takes her shorts and underwear off. The female then spreads her legs exposing her pubic area and buttocks to the camera. The female appears to be prepubescent as she has little to no breast development and no pubic hair. *Id.*

- On September 26, 2019, a user uploaded a file directly to the "requests" channel. *Id.*

    o The uploaded file is an image with six "windows" depicting a prepubescent female engaged in sexually explicit conduct. Specifically, in one "window" the prepubescent female is standing up with her pants pulled down using her hands to expose her vagina to the camera. Two of the other "windows" depict the prepubescent female exposing her chest and her belly to the camera. In one of the "windows," a prepubescent male is engaged in sexually explicit conduct as someone is holding his penis with their hand. In another "window," the prepubescent male and female are engaged in sexually explicit conduct as she places her mouth on the prepubescent male's penis. *Id.*

- On February 5, 2021, the defendant shared the user ID of a minor followed by a description of the content of the minor's live stream on the "dl-links" channel: "[MINOR'S ID NUMBER] – [MINOR'S FIRST NAME] (11) and her sister (8) WARNING chub+ latina (also includes some wbd in one of them), but some sister action Sisters on a Saturday Night. [PASSWORD TO FILE]." *Id.*

The users in the chatrooms, including the defendant, made specific requests for files of

8

certain minors engaged in sexually explicit acts. PSR ¶ 36.  If other users had the requested files, they uploaded the files directly to the chatrooms or sent the files via a third-party file sharing platform. *Id*. For example, on November 8, 2019, the defendant made the following request on the "dl-links" text channel: "Can anyone please re-up Tboy's? She looked so yummy '"chloe from unico. canadian asian 9-10yo bating and posing dropmefiles.com/Ppyxs пароль: mJmpQO'"." *Id*. In response, another user stated, "I have one more file of her... but it looks like all the footage is in 1517053931852.mp4... so no new material. incredible girl." *Id*. On that same date, a user messaged, "DMF.com/Bu8dj пароль: XyZCnP pw: fromrussiawithlove chloe win from unico as requested by [defendant's username on APPLICATION A] (mobile cap)." *Id*. The users, including the defendant, thanked one another for sharing sexually explicit files on the chatrooms. *Id*. For example, on April 17, 2020, in the "dl-links" text channel, the defendant stated, "There were some gems in there, and I want to add my thanks. I always wonder if I will ever have enough time to see all the lowlis[4] hanging out on my drives, but I always peek enough to appreciate." *Id*.

## V.     The Defendant Sexually Exploited Minor Victim 1

In July 2019, the defendant posted in the "line-live" text channel on the chatroom about a particular minor who will hereinafter be referred to as MINOR VICTIM 1 ("MV1").  PSR ¶ 34. On July 12, 2019, the defendant posted on the text channel, "[MV1's Line-Live username] is a mixed girl with a meh cam that was molded she will show when she goes private. Unless she keeps demanding boys go first." *Id*.  On July 15, 2019, the defendant posted on the text channel, "[MV1's Line-Live username] in private (little light skin)." *Id*.  The defendant engaged in a text chat with MV1, a prepubescent child, and persuaded MV1 to engage in sexually explicit conduct. *Id*. For

---

[4] Based on extensive examination of the communications on APPLICATION A, "lowlis" refers to a minor.

example, the defendant told MV1:

- "I wish you could do that without the pan nies on"
- "Take them off under the covers and then show me"
- "Closer"
- "I love it"
- "You are so amazing"
- "I could look at you all day"
- "Daaamn can you spread that boo ty for me?"

*Id*. In response to the defendant's statements, MV1 removed her underwear and exposed her pubic area to the camera. *Id*. The defendant screen recorded this conversation and saved it to a folder on his iPhone 14 Pro in a folder titled, "Best Secret Folder."

## VI.    The Defendant Sexually Exploited Minor Victim 2

As previously stated, the defendant exchanged direct messages on APPLICATION A with users from the chatrooms. *Id*. at ¶ 35. One such private message was between the defendant and a user who will hereinafter be referred to as "APPLICATION A, CO-CONSPIRATOR USERNAME." *Id*. The messages between the users spanned from October 28, 2018, through August 9, 2021. *Id*.

Between October 28, 2018, and August 9, 2021, the defendant and another APPLICATION A user discussed the sexual exploitation of 10-year-old MINOR VICTIM 2 ("MV2").  In or about the summer of 2019, the defendant communicated with MV2 via a photo and video sharing application ("APPLICATION B").  *Id*.  The defendant persuaded MV2 to engage in sexually explicit conduct. *Id*. Unbeknownst to MV2, the defendant requested that the other user remotely log into the APPLICATION B conversations between the defendant and MV2 and record the communications and sexually explicit acts by MV2. *Id*. On July 21, 2019, the other user sent at least one recorded session of MV2 to the defendant via a link on a third-party file sharing platform. *Id*.  The defendant saved sexually explicit images of MV2 on his iPhone 14 Pro in an application

titled, "Best Secret Folder." *Id*.  The images depicted MV2 with Sharpie markers in her mouth and inserted into her vagina. *Id*.

## VII.    The Defendant Sexually Exploited Minor Victim 3

As stated above, on January 16, 2021, the defendant sent the group an image of what appears to be a minor's nude pubic area beside a screenshot from a Snapchat conversation with user "[MV3's username]." *Id*. at ¶ 40. On January 20, 2021, user APPLICATION A, CO-CONSPIRATOR USERNAME stated on APPLICATION A in the "dl-links" channel, "Enjoy. Haven't talked to her in a couple days, but I don't think she has her phone during the week. None of this was forced. She was difficult to get going, but once she did, it was snap after snap after snap. Sorry about the black frames between snap segments. It's the version of Snapchat I'm using (fairly old) and it's not super easy to trim out those bits unfortunately. pw: ``FEEL1NG`` pw: ``[MV3's username] of [MV3's location] on Snapchat``." *Id*. MV3's account was listed as a "friend" on the defendant's "slideonin17" Snapchat account.  *Id*.

On August 28, 2023, 13-year-old MV3 was interviewed. PSR ¶ 41. She recalled speaking to a user on Snapchat two to three years prior. She stated that a member of the conspiracy told her if she did not send a photo, something bad would happen, including that he would tell her mom and dad.  She was scared and sent a member of the conspiracy a photo. *Id*.

## VIII.    The Defendant Coerced and Enticement Minor Victim 4 to Engage in Illegal Sex Acts

Between on or about April 26, 2022, and on or about April 13, 2023 the defendant met MINOR VICTIM 4 (MV4) online. *Id*. at ¶ 43. MV4 stated eventually that she was fourteen years old. *Id*. He then employed the username "markisnva" to communicate with MV4 on Snapchat. *Id*. The two users engaged in sexual conversations and eventually MV4 asked, "are you sure my age is ok daddy" to which Markisnva responded, "It's perfect sweetheart." *Id*. MV4 also provided her CashApp account and Markisnva sent two separate payments of $25 to the account. *Id*. One of the

transactions had the note, "Keep sharing." *Id*. Due to the enticement of MV4 by the defendant and others, MV4 provided child sexual abuse material to the defendant over the internet. *Id*.

## IX.     The Defendant Used Application C to Send and Receive Child Sexual Abuse Material

From between on or about July 22, 2019, and on or about March 16, 2022, the defendant was a member of at least two groups on a social media platform ("APPLICATION C") dedicated to the sexual exploitation of minors.  *Id*. at ¶ 37.

While a member of the groups on APPLICATION C, the defendant utilized three different usernames. PSR ¶ 38.  Members of APPLICATION C groups, including the defendant, discussed minors in a sexual manner and knowingly sent and received images of minors engaged in sexually explicit conduct during the course of the group chats. *Id*.

Below are examples of files sent and received by the users, including the defendant, in one of the APPLICATION C groups.

- On October 9, 2019, a user in the group sent an image to the group depicting a minor female lying on her back. She has a blue t-shirt on with a graphic on the front of the t-shirt. The female is nude from the waist down. The female is spreading her labia with her right hand, exposing her vagina to the camera.

- On November 21, 2019, the defendant utilizing the user account APPLICATION C, USERNAME 1, sent an image of a minor female who is fully nude lying on her left side on a bed. The female has very little breast development. The female has brown hair with what appears to be a filter over her hair depicting three flowers.

- On December 13, 2019, the defendant utilizing the user account APPLICATION C, USERNAME 1, sent four images depicting the same prepubescent minor female. The first image depicts the female pulling up her blue t-shirt and exposing her breast. There is a male standing behind the female. The second photo shows the female sitting on a table and the back of her shirt being pulled up by the male and exposing her back. The third photo shows the female standing up and her blue t-shirt pulled up exposing her breast and the male is standing behind her holding her shirt up. The fourth photo shows the female pulling her gray pants down and exposing her vagina to the camera.

- On February 29, 2020, a user in the group sent an image of two minor females in a room with flower wallpaper that is pink and black in color. Both appear to be nude with their underwear pulled down. The females are standing towards the wall and one of the

females is looking back over her shoulder. The other female's buttocks are exposed to the camera.

- On October 26, 2020, the defendant utilizing the user account APPLICATION C, USERNAME 2, sent an image depicting a fully nude minor female. The female is sitting with her legs spread open and she is exposing her vagina to the camera. The minor has little to no development.

- On November 5, 2020, a user in the group sent five images. The first image depicts a minor female who is nude and sitting on the floor in a bathroom. The female is lying on her back with her head lifted and her legs are in the air. The female's hands are touching her buttocks. The female's vagina and anus are exposed to the camera. The second and third photos are an up-close image of a female's vagina and anus. The female has no visible pubic hair. The fourth and fifth images are a minor female who is nude, leaning on her knees and looking into the camera.

- On January 16, 2021, the defendant utilizing the user account APPLICATION C, USERNAME 1, sent an image depicting MINOR VICTIM 3's (MV3) pubic area. The photo is an up-close image of the female's vaginal area. There is no visible pubic hair. This minor has been identified.

- On December 21, 2021, the defendant utilizing the user account APPLICATION C, USERNAME 1, sent an image depicting a prepubescent minor female who is leaning back with her legs spread in a bathtub, revealing her vagina. The female is completely nude and has pigtails in her hair.

- On December 21, 2021, the defendant utilizing the user account APPLICATION C, USERNAME 1, sent an image depicting a blond-haired prepubescent female with a green sweater on who is lying on her back with her legs lifted in the air. The female does not have pants on. The female's anus and a portion of her pubic area is visible and the focus of the image.

- On December 21, 2021, the defendant utilizing the user account APPLICATION C, USERNAME 1, sent an image depicting what appears to be a minor female lying on her back. The female is completely nude with her knees bent and legs spread so that her vagina is visible to the camera and the focus of the image.

*Id*. at ¶ 39.

## X.   The Defendant Possessed a Vast Collection of Child Sexual Abuse Material

While the defendant was a member of the conspiracy to produce child pornography and during the time when the defendant received child pornography, the defendant was in possession of digital devices that contained images and videos of minors engaged in sexually explicit conduct.

*Id.* at ¶ 42. The FBI submitted 172,707 suspected CSAM images to the National Center for Missing and Exploited Children (NCMEC) and they confirmed that over 1,300 files depicted identified victims. *See* Gov. Ex. 1. There is evidence that the defendant collected these images and videos beginning in at least 2006. *Id.*

## XI.   Procedural History

On September 14, 2023, a federal grand jury sitting in Alexandria, Virginia, returned a six-count Indictment charging Mark Alan Black with conspiracy to produce child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Count 1); production of child pornography, in violation of 18 U.S.C. § 2251(a) and (e) (Count 2); conspiracy to advertise child pornography, in violation of 18 U.S.C. § 2251(d) and (e) (Count 3); distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Count 4); receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (Count 5); and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 6).  *See* PSR ⁋ 4.

On November 16, 2023, the grand jury returned a Superseding Indictment, alleging coercion and enticement, in violation of 18 U.S.C. § 2422(b) (Count 7).  On January 23, 2024, the defendant entered a plea of guilty to Counts 1 and 7.  PSR ⁋ 4.

### SENTENCING ANALYSIS

## I.   Statutory Penalties and Sentencing Guidelines Calculations

Count 1 of the Superseding Indictment, conspiracy to produce child pornography, carries a minimum term of 15 years' imprisonment with a maximum term of 30 years' imprisonment. *See* 18 U.S.C. § 2251(a) and (e).  Count 7 of the Superseding Indictment, coercion and enticement, carries a minimum term of 10 years' imprisonment with a maximum term of life imprisonment.  *See* 18 U.S.C. § 2422(b)(2).  Following any term of imprisonment, the defendant

must be placed on supervised release for a term of at least 5 years up to a lifetime term.  *See* 18 U.S.C. § 3583(k).

As the Court is aware, although the Sentencing Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing."  *United States v. Booker*, 543 U.S. 220, 264 (2005).  Thus, at sentencing, a court "must first calculate the Guidelines range" applicable to the defendant.  *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49–50 (2007).

Here, the PSR correctly calculated the total offense level for the defendant under the Guidelines (USSG). The combined adjusted offense level is 48. The defendant has demonstrated acceptance of responsibility for this offense and is therefore entitled to a two-level decrease in offense level under USSG § 3E1.1(a).  *Id.* at ¶ 80. This two-level decrease is correctly reflected in the PSR.  Moreover, the defendant has assisted authorities in the prosecution of his own misconduct by timely notifying the government of his intention to enter a plea of guilty. Accordingly, the government moves for an additional one-level decrease in the offense level pursuant to USSG § 3E1.1(b) and the plea agreement.  *Id.* at ¶ 81.  Due to USSG Ch.5, Pt.A, comment. (n. 2), the offense level is capped at 43. The defendant's criminal history score is one, resulting in a Criminal History Category I.  *Id.* at ¶ 86.  The guidelines calculation for an offense level of 43 and a Criminal History Category I is 360 months to life imprisonment. *Id.* at Part D.

## II.    Sentencing Recommendation

After calculating the Guidelines range, a sentencing court must then consider that range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005); *see also Gall v. United States*, 552

U.S. 38, 50 (2007) (sentencing court "must consider the extent of the deviation [from the Guidelines] and ensure that the justification is sufficiently compelling to support the degree of the variance.") These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Here, a sentence of 360 months is appropriate given the seriousness of the defendant's crimes, the harm he caused to many children, the risk of recidivism and the need to deter the defendant and others from perpetrating similar crimes.

### A. The nature, circumstances, and seriousness of the defendant's offense

The defendant collected, distributed, and produced CSAM for over a decade—all while maintaining the façade of a law-abiding attorney. Although multiple victims were identified in the defendant's conspiracy, the true scope of the harm the conspiracy caused will never be known. He worked in concert with multiple offenders, for over five years, on numerous social media platforms, using half a dozen different monikers, to exploit and attempt to exploit *thousands of minors or suspected minors*, many of whom have yet to be identified by law enforcement.

For example, the group used computer programs to auto-record victims. On a single day, the program auto-recorded 463 separate minor's live-streams and the program ran from October 30, 2019, to August 22, 2021, so there are potentially over 330,000 recordings available. This estimate represents the recordings on just 1 of the approximately 14 different social media channels that the defendant and his co-conspirators used to exploit minors.  While it's possible

that not every recording constituted CSAM, the group was surveilling thousands of minors'
accounts, day and night, in an attempt to catch them engaging in sexually explicit conduct.

The two victims of the conspiracy whom law enforcement was able to identify, were both
under 12 years old.  A group member threatened the child to obtain CSAM.  Then, after the
victims shared their images (with people whom they believed were children their age), the
defendant and his friends sent them across the Internet.  Worse still, they made demeaning,
humiliating, and personally identifying comments about the victims, showcasing the utter
depravity of these groups:

- On October 29, 2019, a co-conspirator stated, "MV1 from 28 Oct 2019
  ```dropmefiles.com/[REDACTED] pw: Who the fuck pours urine on
  themselves```."

- On July 15, 2023, a co-conspirator stated: "[MV1's] got that gross black people
  hair 😠."

- On January 20, 2021, a co-conspirator stated: "[MV3] was difficult to get going,
  but once she did, it was snap after snap after snap. Sorry about the black frames
  between snap segments. It's the version of Snapchat I'm using (fairly old) and it's
  not super easy to trim out those bits unfortunately. pw: ``FEEL1NG`` pw: ``[MV3
  full name] of [MV3's city and state] on Snapchat``."

- On June 19, 2019, the defendant stated: "I don't care about the 3 black girls I've
  made rob one out in the last 24 hours because that's easy. [MV2] is a grail."

The defendant's contributions to this network designed to find and exploit children
represent only one aspect of his vast criminal conduct.  He also found minors online, exploited
them for CSAM, and kept it in his personal collection, electing not to share it with the wider

17

group of predators interested in the material.  MV4 and the defendant met on an online

application that had no connection to the conspiracy and he communicated with her for a year,

enticing her to send him round after round of CSAM.  The statements made by MV4 show that

the defendant preyed on her loneliness and desperation for connection, exploiting vulnerabilities

particular to young teenage girls to get CSAM from her.

The defendant's sexual predation extended beyond the United States.  Law enforcement

uncovered a chat on the defendant's device that showed he had communicated with an individual

overseas who purported to have two minor daughters for the defendant to exploit.  *See* Gov.

Exhibit 1.  In this chat, which spanned from July 13, 2021 through July 14, 2021, the defendant

(live:.cid.570881eb5d46a399) asked about buying videos, images, and live shows of the other

user's 10 and 12 year old daughters.  *Id*. The defendant's Google translate history showed that

August 2022 and May 2023 he translated phrases including, "not too young. sorry for nervous"

"not too young. boy or girl?" "i want to make love to your small body all day" and "such a small

girl fit so much." *Id*.

Multiple conversations occurred between the three identified victims, their parents, and

victim witness coordinators. During these calls, parents of the minors affected by the defendant's

conduct explained:

- Their child has struggled with suicidal thoughts.

- Their child has regressed mentally and can no longer participate in school.

- Their child is in therapy to address the trauma of being threatened/exploited
  before they even hit puberty and knew what sex was.

Every effort was made to obtain victim impact statements from these identified victims, but none

have been received at this time. However, research shows that it is not uncommon for victims to

struggle to discuss their sexual abuse. For victims of child sex abuse, it is remarkable to disclose abuse at all, regardless of their age. Data from the Department of Justice suggests that 86% of child sexual abuse goes unreported altogether. However, when victims of child sex abuse do report, a high percentage of them delay disclosure well into adulthood.[5] For the victims in this case—discovered just months or only a year ago—sometimes it is still far too traumatic for them to reflect on their experience at this time.

In addition to the minors whom the defendant tracked down online, groomed, and sexually exploited, he had over 172,707 suspected CSAM images representing thousands of additional victims.  The defendant's possession of these images re-victimized numerous children and contributed to the broader cycle of child sexual abuse.

Such possession crimes inherently involve the sexual abuse of children, even if no new child pornography is produced.  *See New York v. Ferber*, 458 U.S. 747, 759 (1982). Trafficking in child pornography is "intrinsically related to the sexual abuse of children in at least two ways."  *Id.*  First, increased demand for child pornography is associated with increased supply: Far from being victimless, trafficking in child pornography "harms children in part because it drives production [of child pornography], which involves child abuse."  *Paroline*, 572 U.S. at 439-40; *see also Ferber*, 458 U.S. at 759 ("[T]he distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.").

---

[5] *See Youth Victimizations: Prevalence and Implications*, Department of Justice (2003), Page ii, https://www.ojp.gov/pdffiles1/nij/194972.pdf. *See also* Hanson, R. et al., *Factors related to the reporting of childhood rape*, Child Abuse & Neglect, 23, 562 (1999), https://www.ncbi.nlm.11ih.gov/pubmed/10391513 ("82.9% did not report any of the rapes they experienced during childhood.").

Second, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography.  Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'"  *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012) ("[C]hild pornography creates an indelible record of the children's participation in a traumatizing activity, and the harm to the child is only exacerbated by the circulation of the materials.").  "Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children "must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," and they "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547-48.

## B.  The need to promote respect for the law and to afford adequate deterrence to criminal conduct

This is a case of an individual who *knew* the law, *knew* the consequences, and still proceeded to exploit children in every way possible for over a decade. A sentence of three-hundred and sixty months is sufficient but not greater than necessary to deter the defendant and others from engaging in this conduct in the future.  The sentence in this case must constitute a loud and clear warning to potential sexual offenders that severe consequences will result from

such atrocious acts.  Indeed, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'"  *Irey*, 612 F.3d at 1211 (citation omitted).  "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'"  *Id.*  (citation omitted); *accord United States v. Garthus*, 652 F.3d 715, 721-22 (7th Cir. 2011); *see also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").

Distressingly, the market for child pornography has continued to grow, and to become more depraved, in recent years.  *See, e.g.*, U.S. Sent'g Comm'n Hr'g on the Child Pornography Guidelines 1-2 (Feb. 15, 2012) (statement of James M. Fottrell, Steve DeBrota & Francey Hakes, Dep't of Justice), available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf.  While CSAM in the past depicted naked children standing, sitting, or in secluded locations, not, the content has escalated. Of the child pornography victims identified by law enforcement, 52% - 55%* appear to be prepubescent, and 6% appear to be infants or toddlers.[6] The need for effective deterrence through a severe sentence is therefore essential. More specifically, the need to deter offenders that use social media websites is critical: "In 2019 close to 70 million images of child

---

[6] Ethel Quayle & Terry Jones, *Sexualized images of children on the internet*, 23 SEXUAL ABUSE, 7–21 (2011).

abuse were reported to the National Center for Missing and Exploited Children (NCMEC). The vast majority of this material was circulated on social media, in particular Facebook platforms."[7]

In considering the length of time this defendant has been engaged in child exploitation crimes, the government maintains that the risk of recidivism associated with this defendant is high.  Though no study or expert can predict whether this defendant will or will not choose to return to exploiting children, his actions suggest that such concerns are well-founded.  As soon as the defendant became an adult, he began sexually exploiting children and has not demonstrated that he can practice self-control on his own.  Instead, the defendant's years-long conduct indicates an ongoing sexual interest in children and a disregard for their wellbeing and the law. Thus, this agreed upon sentence is necessary to deter the defendant from engaging in this dangerous and harmful conduct after he is released.

### C.  The history and characteristics of the defendant

The defendant had a relatively stable life from 1991 onward, when he graduated high school in Arizona. Since then, he obtained a law degree, married, and had two children. From April 2001 to April 2013, the defendant earned between $220,000 and $230,000 per year at a law firm. Then, when he moved to the Federal Deposit Insurance Corporation (FDIC), he ended his career there making $250,000 a year. He could have used his education to find ways to battle his sexual interest in children or he could have used his large salary to find treatment or assistance with combatting his proclivity. If there was ever a defendant that had the time, resources, and opportunity to reflect on his choices—of which there was so very many—and stop exploiting

---

[7] *How the internet is drowning in child sex abuse content*, *ACCO*. Available at: https://www.counteringcrime.org/how-the-internet-is-drowning-in-child-sex-abuse-content (Accessed: 15 April 2024).

minors, this is such a defendant. Instead, he did nothing but feed his unsatiable desire to harm children.

The notion that the challenges faced by the defendant in his youth are a justification or mitigating factor for his crimes minimizes his own volition and denigrates others who have had similar life obstacles but never committed such heinous crimes. Every individual faces challenges in life, some more severe than others. But no challenge excuses or mitigates the vile offenses committed by the defendant. The victims of his crimes—children seeking friendship—are the ones who experience challenges beyond imagination. On balance, the history and characteristics of the defendant make clear that he has lived a stable life with an extremely supportive and loving family and had adequate education and financial resources to live a law-abiding life. PSR ¶¶ 128-142. He was not corralled into this crime by a series of unfortunate life circumstances or because of his poor mental health. Rather, he chose his path. His sentence should reflect those facts.

### III.    Supervised Release

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release here is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See, e.g.*, Lifetime Consequences for Sex Offenders Act of 2002, H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes [and

that] . . . the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66, at 49–50 (2003) (discussing how amendment to 18 U.S.C. § 3583(k) "responds to the long-standing concerns of Federal judges and prosecutors regarding the inadequacy of the existing supervision periods for sex offenders . . . whose criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison").  Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, *see* USSG § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citations omitted).

Here, the defendant's long history of exploiting children demonstrates his heightened risk of recidivism and necessitates a significant term of supervised release. Therefore, the United States believes that it is appropriate to impose a lifetime term of supervision with the conditions of supervision contemplated under 18 U.S.C. § 3583(d) and USSG § 5D1.3(d)(7) for sex offenders required to register under the Sex Offender Registration and Notification Act.

## IV.    Special Assessments Under the Justice for Victims of Trafficking Act (JVTA) & the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA)

The Justice for Victims of Trafficking Act (JVTA) imposes a mandatory assessment of $5,000 on any non-indigent defendant convicted of, among other offenses, receipt of child pornography.[8] *See* 18 U.S.C. § 3014.  While the statute is silent as to how to determine

---

[8] The money obtained from this assessment goes to the Domestic Trafficking Victims' Fund, which awards grants and enhances programming for victims of human trafficking and child pornography. The § 3014(a) assessment is payable after the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim compensation.  *See* 18 U.S.C. § 3014(b) & (e).

indigence, courts have treated the imposition of this assessment like the imposition of other post-conviction assessments, where "[t]he defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is not likely to become able to pay a fine upon his release from his term of imprisonment."  *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017) (internal citations and quotation marks omitted).  Relevant factors to consider in this determination include a defendant's future earning potential, assets, educational background, employment history, age, and physical condition.  *See United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020) ("[W]e agree with our sister circuits that a district court may consider a defendant's future earning potential when determining his ability to pay an assessment under 18 U.S.C. § 3014(a)." (citations omitted)); *see also United States v. Mann*, 770 F. App'x 649, 650 (4th Cir. 2019).

Here, the PSR details the defendant's assets and liabilities and concludes that the defendant appears to be unable to pay fines and the cost of incarceration or supervision.  PSR at ¶ 144.  The United States disagrees with this assessment. The defendant is not indigent. He retained two separate attorneys for this case, was estimated to have a net worth of $494,380.00, and is physically capable of working following his term of incarceration.  He has a high degree of education and was employed prior to his incarceration and was making $250,000.  *Id.* at ¶ 140-142.  He should be able to redirect those funds to pay a $10,000 special assessment upon his release from imprisonment if not at the time of sentencing.  *See* 18 U.S.C. § 3613 (noting that the liability to pay a fine or restitution shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment, whichever is later); *see also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018).  Accordingly, the United States respectfully

requests that the Court find the defendant non-indigent and impose the mandatory $10,000 special assessment under 18 U.S.C. § 3014.

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA).  The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess not more than $35,000 on any person convicted of . . . [an] offense for trafficking in child pornography."  18 U.S.C. § 2259A(a)(2).  Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* 18 U.S.C. §§ 2259(d), 2259B, and shall be paid in full after any special assessment under 18 U.S.C. § 3013 and any restitution to victims of the defendant's offense, *see* 18 U.S.C. § 2259A(d)(2).  In determining the amount to be assessed under 18 U.S.C. § 2259A, courts should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) and the guidance in 18 U.S.C. § 3572 for the imposition of fines.  *See* 18 U.S.C. § 2259A(c).  The United States respectfully requests that the Court impose a reasonable special assessment under 18 U.S.C. § 2259A, in addition to the $100 mandatory special assessment for his felony conviction pursuant to 18 U.S.C. § 3013.

### V.    Restitution

Pursuant to 18 U.S.C. §§ 2259 and 3663, the defendant must pay restitution in the full amount of the victims' losses.  In the Plea Agreement, the defendant waived the requirement under 18 U.S.C. § 3664(d)(5) that the Court determine a final restitution amount no later than ninety days after sentencing.

The government has received restitution requests from 11 victims for a total amount of $75,000.  Those restitution requests were provided to probation and to defense counsel.  Upon information and belief, the defendant has reached restitution agreements with five victims and

there are still six restitution requests outstanding at this time. The government expects one more restitution request from a production victim. The defendant conveyed he anticipates needing more time to negotiate further with victims' counsel and will thus request restitution be decided at a later date.

## VI.   Forfeiture

The United States will submit a consent order of forfeiture, signed by the defendant and his counsel, at the sentencing hearing, and respectfully requests that the Court order such forfeiture as part of the judgment.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court impose a sentence that includes a term of three-hundred and sixty months imprisonment, a lifetime term of supervised release, a $200 special assessment pursuant to 18 U.S.C. § 3013, a $10,000 special assessment pursuant to 18 U.S.C. § 3014, a reasonable special assessment under 18 U.S.C. § 2259A, and restitution to be decided at a later date.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By: _____/s/_____

McKenzie Hightower
Special Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 203-0551
Fax: (703) 299-3980
Email: mckenzie.hightower@usdoj.gov

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel of record in this case.

Respectfully submitted,

_____/s/_____
McKenzie Hightower
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: (703) 203-0551
Fax: (703) 299-3980
Email: mckenzie.hightower@usdoj.gov