IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARK BLACK, | ) | CRIMINAL NO. 1:23-CR-146 |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

COMES NOW, the defendant, Mark Black, through counsel, and in accordance with 18 U.S.C. Section 3553(a) and Section 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), respectfully submits to this Honorable Court his position with respect to sentencing.  The mandatory minimum sentence in this case is fifteen years. For the reasons set out below, fifty-year-old Mr. Black respectfully requests that this Honorable Court vary from the recommended Sentencing Guideline range and sentence him to 180 months imprisonment followed by a term of supervised release with conditions and required sex offender registration as a sufficient but not greater than necessary sentence.

In further support of his position, Mr. Black, through counsel, offers the following:

## PSR Objections

Mr. Black has no objections to the PSR.

## Sentencing Factors Under Section 3553(a)

Mr. Black has taken responsibility for, and acknowledged the gravity of, his conduct.  While undoubtedly serious and distressing, importantly, his conduct does not

involve (1) any hands-on physical abuse of a minor by him, (2) any efforts to meet a minor in person, (3) any efforts by him to blackmail or threaten any minors in connection with his unlawful conduct, or (4) a prior serious criminal history.  The lack of these factors, combined with his otherwise substantial positive social contributions in the face of a very troubled upbringing and the deep shame and remorse that he feels, militate in favor of the mandatory minimum sentence, especially when the Court considers other prior sentences in similar and related cases.

## I.   <u>Avoiding Unwarranted Sentencing Disparities</u>

Section 3553(a)(6) charges this Court with avoiding unwarranted sentencing disparities. A review of prior sentences by the Court in similar cases reflects that in production cases both with and without substantial aggravating factors, this Court has given a sentence at or near the mandatory minimum range.  Such explicitly identified aggravating factors include (1) hands-on sexual abuse of minors by the defendant, (2) recidivism, (3) a jury trial, or (4) or a lack of remorse for the conduct.  Mr. Black's case is absent such factors. He shows remorse[1] and reflects a lifetime of good deeds for his family and his community after somehow overcoming a horrific childhood. The lengthy, mandatory sentence of 15 years is appropriate.

---

[1] *See generally* Under Seal Exhibit A (Defendant's Letter to the Court).

By ways of comparison, the following cases are illustrative:

**A.  Prior Sentences of 15 years or Less in Production Cases**

**1.  *United States v. Janes* 1:23CR140 (LMB) (Sentenced to 15 years).**

In this case, the defendant had spent his adult life collecting and producing child pornography. Moreover, the defendant also sought to meet minors in person.  The government in its sentencing memo noted:

> Amid purchasing CSAM, producing CSAM, and communicating with multiple minor boys, the defendant met Minor Witness 1 in Washington D.C. in February of 2023. See PSR at ¶ 18. The defendant communicated with Minor Witness 1 from July 22, 2022, to May 14, 2023. He groomed Minor Witness 1 for nearly six months, asking for photographs of what he wore on multiple occasions before meeting him in person at a restaurant. *After they met, the defendant tried to escalate their encounters by inviting him to spend the night at his house on February 5, 2023*.

ECF. Doc. 39 at 6-7 (emphasis added). Mr. Black's actions were more limited and less physically dangerous. He never tried to escalate virtual encounters to direct, in-person, physical encounters.

**2.  *United States v. Daniel*, 1:17CR110 (AJT) (Sentenced to 15 years, 2 months)**

In this case, the defendant met in person with the minor victim and twice had sex with that victim. He also sexually abused two other minor victims. According to the government's sentencing memorandum, "[t]he defendant has pled guilty to commercial sex with a 14-year-old child, in violation of 18 U.S.C. §§ 1591(a)(1) & (b)(2), and production of child pornography, in violation of 18 U.S.C. § 2251(a). ECF Doc. 59 at 1. The government also noted that "[i]t is beyond dispute that sex with a 14-year-old (particularly on more than one occasion) is a particularly horrible offense that deserves significant punishment. The Defendant twice took advantage of a young runaway who was desperate for money." *Id.* He sexually abused two other minor girls as well. The

government noted that "[o]bviously, the defendant had no reservations about involving minors in his sexual conduct and such conduct that harms children cannot be tolerated. . . But the production of child pornography is also a grievous offense." *Id.* Mr. Black too participated in the grievous offense of child pornography. He did not have actual physical contact and sex with any minor victims.

### 3. *United States v. Nader,* **1:19cr201 (LMB) (Sentenced to 10 years imprisonment)**

This defendant had a long history of inappropriate sexual behavior with minors, including actual in-person sexual contact that led to his conviction in another jurisdiction. According to the Government's Sentencing Memorandum, ECF Doc. 188:

> Beginning in 1984, his first contact with law enforcement was through the mail he ordered to obtain child pornography and letters sent boys in another state under an alias to mask his detection. PSR ¶¶ 97-100. Then in 1998, he was again under investigation for the same kind of offense. Id. ¶¶ 102-108. In 1991, he was convicted of transportation of child pornography when authorities seized videos surreptitiously hidden in candy tins. Id. ¶ 119. Abroad, the defendant expanded his horizon through direct sexual contact with minors, including contact with the victim in this case leading to the present offense of transportation of a minor, and in 2003, the defendant was convicted in the Czech Republic for offenses related to sexual contact with minors. Id. ¶¶ 27-34, 54-62, 123-126. By 2009, he was corresponding with pedophiles through electronic means, and by 2012, through social media apps leading to the current offense. Id. ¶¶ 17-26, 110-117. The most recent benchmarks were in 2018 and 2019 when the defendant was again was found to possess mobile devices containing chats, videos, and internet searches clearly demonstrating his continual interest in child pornography and the sexual and physical abuse of children. Id. 34-54.

### B. Prior Sentences of 16 years in Production Cases

While counsel thinks that the just sentence in this case is 15 years of imprisonment, counsel notes that the Court had sentenced above the mandatory minimum

in some cases where the conduct is more aggravated. As discussed below, Mr. Black's case calls for a sentence of 15 years, slightly below the sentences in the following cases.

**1.  *United States v. Friedel*, 1:14-cr-383(TSE) (Sentence of 16 years)**

This is another case in which the defendant met the minor victim in person and had sex with the minor victim. The defendant also tried to blackmail minor victims who had been recorded. The Court imposed a sentence of 192 months (16 years) in a case in which the defendant met a 15-year-old minor on the internet, caused her to send him pornographic images of herself, *and then had numerous sexual encounters with the minor (that he recorded)*; the defendant also caused four other minors to create and send child pornography, and *used those images in attempts to threaten and blackmail the minors* into engaging in further conduct.

**2.  *United States v. McGalem*, 1:22cr48 (AJT) (Sentence of 16 years)**

The facts of this case do not involve hands-on sexual encounter and thus are more similar to Mr. Black's case than the aggravated cases discussed above. Significantly, the defendant in this case, unlike Mr. Black, had an aggravated prior criminal history score. While Mr. Black is in Category I for Criminal History, this defendant was in Category II.

This production case involved production and attempted production of child pornography from many minors, with guidelines of life imprisonment. The government's sentencing memo notes that the defendant's efforts to produce child pornography "succeeded with Minor Victim 2, who was under the age of 12 years at the time, persuading Minor Victim 2 to take and send pictures of his penis. PSR at ¶ 38. The defendant used a similar formula to entice and coerce Minor Victim 3 and Minor Victim 6 into sending sexually explicit pictures to him."  ECF. Doc. 52 at 5. Further, beyond the

identified victims, there were numerous other "explicit images depicting other apparent and suspected minors. None of the minors depicted in these other photos and videos have been identified. And because of the nature of these photos and videos, these minors are unlikely to ever be identified." *Id.* at 6.   In contrast to Mr. Blacks case, "The PSR also properly calculated the defendant's criminal history category as a II." *Id.* at 8.

### C.  Prior Sentence of 18 years in Production Case

1. *United States v. Sanders,* **1:20 CR143(TSE) (sentenced to 18 years imprisonment)**

The defendant in this case had a demonstrated interest in sexual violence, which he coerced his minor victims to undergo and record.   In this case, the government's sentencing memo noted that the

> The defendant is a sexual predator with a demonstrated interest in bondage, torture, and rape. For years, he sought out vulnerable minors online and induced them to record and *send him videos of themselves engaging in sexualized, self-inflicted violence* and other sexual acts. His predation followed a similar pattern: he would find a minor on an online forum or mobile application, chat with the minor, and then introduce "punishments" that required the minor to send him sadomasochistic and pornographic content. At the same time, he was amassing a collection of child pornography from the dark web and other sources depicting shocking acts of sexual violence, including videos depicting the rape of bound-and-gagged children.

ECF Doc. 604 at 1 (emphasis added).   Furthermore, this defendant refused to accept responsibility: he went to trial.   More so, even after his trial, the defendant displayed no shame or remorse:

> Notwithstanding the severity of his crimes, the defendant has shown no contrition. Instead, he has attempted to shirk responsibility at every turn— claiming, variously, that he did not seek out child pornography (despite having it on nearly every device in his bedroom); that he is a victim who was taken advantage of (that is, by the very minors he exploited); that he was mentoring and "push[ing these minors] to be the best person they can be" (by subjecting them to his abuse); and even that he was protecting

them (by exploiting them before some hypothetical offender could). While his excuses are muddled, the through-line is clear: <u>*he lacks a scintilla of remorse*</u>.

*Id.* (emphasis added).  And like the defendants referenced above, this defendant too met his minor victims in persons, including forcing one to undergo sexual violence. As reported in the case,

> <u>*several of the victims reported that he met them in person, and one reported that the defendant forcibly locked a cage-like device around his genitals*</u> in his high school's parking lot. A review of his chats, on other hand, makes his true motivations clear: he sought out minors who felt confused or isolated, or ideally both, because he could more easily groom them into engaging in the kind of sadomasochistic relationships he found sexually appealing. When the minors resisted his degrading "punishments"—some of which he described as "cock and ball torture"— the defendant would respond with threats, dismissal, or self-pitying manipulation, suggesting that they failed to appreciate how difficult he had it as their "dom" or "master". And at the same time, he was seeking out videos of minors being whipped, bound, and raped.

*Id.* It is fair to say that despite the admitted seriousness of Mr. Black's conduct, both his conduct and his mental response to his conduct pale in comparison to the violence and remorseless of this defendant.

**2. A Production Conspiracy: Relevant Prior Sentences include *United States v. Zwengel* 1:15cr42 (TSE) (18 years), *United States v. Hitosis* (18 years), *United States v. Dyke* 1:16cr128 (TSE) (18 years, 2 months), *United States v. McNevin*, 1:15cr42 (19 years), *United States v. Parson* 1:16cr128 (TSE) (17.5 years), and *United States v. Cortez*, 1:16cr128 (17.5 years).**

Because Mr. Black's case also involves the participation of others in a conspiracy, this prior conspiracy case in the district is relevant and, discounting the mitigation and remorse presented by Mr. Black, serves as an upper bound of a possible sentence in this matter.  In this case, a number of individuals conspired to produce child pornography and share it with each other.  The general conspiracy is described as follows in the government's sentencing memo of one of the defendants:

The conspiracy centered on two websites (Website A and Website B) that were operated for the purpose of coercing and enticing minors to engage in sexually explicit conduct on web camera. Statement of Facts as to Stephen R. Funk (SOF), Dkt. 99 at ¶ 1. Members of the websites recruited minors to visit their websites from mainstream social media websites popular with young children and teenagers. SOF ¶ 2. . . Using a combination of text-chatting and deceptive loop videos, the members of the websites enticed and coerced the minor to engage in sexually explicit conduct on web camera. SOF ¶ 4.

. . .

The sophistication of the conspiracy, including the distinct roles played by members and its technical automation, resulted in the production of approximately 9,000 child pornography videos, and the victimization of potentially 1,000 minors, more than 200 of whom have been identified by the FBI. More than 137 of these victims engaged in sexually explicit conduct on the websites.

These minors and their families have suffered real harm, as documented in the victim impact statement included in the presentence investigative report and as described in the live victim impact statements provided to the court at the sentencing hearings of co-conspirators on September 18 and December 5, 2015. Case No. 1:15-CR-42, Dkt. Nos. 151, 181. The minors have suffered not only by the deception, manipulation, and abuse that led to the creation of videos, but also from the knowledge that they were recorded and viewed by multiple adult members of the conspiracy. They will further suffer from the fear that the videos of them, created through manipulation and without their knowledge or consent, can be more widely circulated.

*United States v. Funk*, 1:15cr172 (TSE), ECF. Doc. 170 at 1, 6-7.[2]

---

[2] Some of the cases in the conspiracy had the aggravating factors like a prior child sexual assault conviction history or failure to accept responsibility, and they received sentences of 21 or 22 years. *See United States v. Funk*, 1:15cr172 (TSE) (22 years) (which according to the government's sentencing memo "differs from these co-conspirators in one other respect. He has a criminal history, which includes a conviction for sexual assault of a child . . . a sentence in this case to 22 years imprisonment . . . would avoid unwarranted sentence disparities); *United States v. Hendrix* 1:15cr172 (21 years) (in which according to the government's sentencing memo, "[t]he defendant did not accept responsibility, pleaded not guilty, and put the government to its burden at trial. This involved the testimony of an 11-year-old minor victim and parents of other minor victims. . . The defendant should therefore receive a greater sentence than his co-conspirators—a sentence in excess of 21 years imprisonment—to account for his lack of acceptance of responsibility for his crime").

In contrast to these defendants, Mr. Black's case is distinguishable from that conspiracy on two grounds.  First, as set forth in the statement of facts in that case and as articulated above, the number of confirmed victims and images generated in that conspiracy was larger and the overall damage to society appeared far greater, thus making conspiratorial liability higher.[3]  Second, the case was nearly a decade ago, and since then, the variance in sentences in these types of cases have drifted downward as this court has been better presented with a more evolved understanding of the motivations of persons charged with such cases.  While Judge Ellis' sentences of 17-18 years for these defendants are relevant considerations, the slightly less, mandatory minimum sentence of 15 years for Mr. Black, particularly in light of his horrific childhood mitigation, is appropriate.

Indeed, one can see the better fit of Mr. Black's case and sentence with the district's more recent production cases in this district. *See e.g.*, *Janes. supra* (15 year sentence in 2023 where in addition to production "the defendant tried to escalate their

---

[3] The government in its memo assigns speculative numerical values to this conspiracy. As its opening argument, it says that "[a]lthough there are four identified victims in this case, the defendant and his co-conspirators were recording over 330,000 minors a day." On page 16, however, the government clarifies that "the group used computer programs to auto-record victims. On a single day, the program auto-recorded 463 separate minor's live-streams and the program ran from October 30, 2019, to August 22, 2021, so there are potentially over 330,000 recordings available," (a number the government arrived at by multiplying every live-stream by the number of days of the conspiracy).  These numbers were not included in either the statements of facts or the presentence report.  Moreover, it would be highly speculative to even attempt to guess the low fraction a computer program auto-recording people on live-streaming apps like Instagram-Live was pornographic content, since much of the content is people just living their ordinary daily lives.  Further, Mr. Black had a more limited role, and was not involved in the creation of the software programs, the sorting of their files, or the uploading of those files from the programs.  In his more technologically limited role, Mr. Black was involved with four minor victims in this case. And with respect to CSAM, it is important to distinguish between the "172,707 suspected CSAM images" referenced by the government and the "over 1,300 files" referenced by the government on page 14 of its memo.

encounters by inviting him to spend the night at his house on February 5, 2023."); *Daniel, supra* (15 year, 2 month sentence in 2017 where the defendant "pled guilty to commercial sex with a 14-year old child"  and "sexually abused two other minor girls as well"); *Sanders, supra* (18 year sentence in 2020 where the production involved coercing minors to "send him videos of themselves engaging in sexualized, self-inflicted violence," where "several of the victims reported that he met them in person, and one reported that the defendant forcibly locked a cage-like device around his genitals," and where the defendant went to trial, blamed everyone else for his conduct, and "lack[ed] a scintilla of remorse.").  In view of these cases, as well as Mr. Black's background and circumstances as more fully set forth below, a sentence of 15 years is lengthy and appropriate.

### D. Co-Defendant in this Case with Prior Possession of Child Pornography Conviction Sentenced to 20 years

*1.  United States v. Ritenour* - **1:23CR38(LMB) (sentenced to 20 years)**

Patrick Ritenour was sentenced to 20 years in connection with this case.  Mr. Ritenour is on the sex registry for prior child pornography convictions arising out of the Fauquier County Circuit Court in CR12000464-469.  In Fauquier, he was originally charged with multiple counts of both distribution of child pornography (carrying mandatory minimum time) and possession of child pornography.  He pleaded to the possession charges, and received an active term of 18 months imprisonment.

In his case, he received a tremendous bargain.  Rather than face the 25 mandatory minimum if he were charged with production of child pornography, the government compromised and only charged him with a 15-year mandatory minimum.  Under 18 U.S.C. § 2251(e) a defendant who is guilty of production and has a prior child pornography conviction must be "imprisoned for not less than 25 years nor more than 50

years."  By contrast, if a previously convicted individual is charged with receipt or distribution under § 2252(b)(1), he must be imprisoned for "not less than 15 years nor more than 40 years."  In connection with Mr. Ritenour's plea bargain, the government released him from the 25-year mandatory minimum, but he was not allowed to argue for the 15-year mandatory minimum, and the Court imposed the 20-year agreed sentence—5 years below the mandatory minimum he was facing.

This was despite the fact that Mr. Ritenour's role in this conspiracy is at least equal to, and actually more than, that of Mr. Black. Mr. Ritenour was involved with the leader of the conspiracy, Mr. Arin Ellis, in developing and maintaining the software needed to carry out the conspiracy.  He bears direct responsibility for the images raised by the government that are discussed supra in footnote 3. Mr. Ritenour, also, like Mr. Black, was also engaged in chatting with minors in furtherance of the conspiracy. On top of his greater role in the conspiracy, Mr. Ritenour's criminal history – with a prior child pornography conviction – is starkly worse than that of Mr. Black. Given Mr. Ritenour's 20-year sentence, a lesser but still severe sentence of 15 years for Mr. Black is appropriate.

**E.  Summary Analysis**

Mr. Black's conduct was extremely serious.  When compared against other cases in this district, a sentence of 15 years is appropriate such that any sentence greater would yield an unwarranted sentencing disparity.  Mr. Black did not touch any child, nor did he ever meet or attempt to meet with any child.  He himself never threatened or blackmailed anyone;  indeed, to the contrary, as cited below, he admonished other members of the conspiracy not to use any threatening behaviors in the course of the conspiracy.  He has

no criminal history other than a DUI.  As more fully set forth below, his 50 years of life outside of this offense militate in favor of a lower, but still very serious and lengthy sentence.  He accepted responsibility and did not proceed to trial.  He feels and expresses remorse.  For all these reasons, the mandatory minimum sentence is commensurate with other cases in the district and avoids unwarranted sentencing disparity.

## II.     Additional Information Regarding the Facts of the Case

The Statement of Facts in this case, while accurate, omits important information relevant to the Court's evaluation of Mr. Black's conduct in this case.  For instance, the Statement of Facts in paragraph 7 states that Mr. Black wrote about his understanding of how the site worked: "Back from work and ready for introductions. Globalist, who likes all flavors (chocolate, caramel, lemon, vanilla, and whatever else there is) with a taste for 10-12, but flexible on the lower bound to...welp…speech and the upper bound to legality."  But it omits the very next sentence, in which Mr. Black writes "Enjoy the company of others—and *hate coercion in all forms (to a fault)*."[4]  In doing so, he admonished others in the conspiracy to refrain from any threatening or comparably coercive behaviors.

Additionally in paragraph 43, the Statement of Facts notes that after the conspiracy was over in October of 2021, Mr. Black met MINOR VICTIM 4 (MV4) online.  MV4 stated *eventually* that she was fourteen years old."  What is omitted are the facts that Mr. Black met the minor victim on an adults-only application and that the minor victim originally stated she was 18 when she met him online. While Mr. Black remains guilty of the offense as did not stop engaging with her after she stated that she

---

[4] *See* Under Seal Exhibit B.  To the extent that other individuals engaged in such conduct, it was unknown to Mr. Black, consistent with his expressed disapproval of such conduct.

was younger, that is a somewhat different circumstance than if he had at the outset continued to seek out online contact with minors after the conspiracy ended in 2021.

Further with respect to his role in the conspiracy, unlike others, Mr. Black never exercised technical control of the server, never asked to be an administrator for the server, never became an administrator of the server, never recommended members from outside to join the conspiracy, and never undertook any major initiatives. He was a user of the server who sometimes voiced his opinions, but was not a leader or content-manager. Other individuals in the conspiracy, by contrast, had significant additional roles – they created the server, they invited new people to join the conspiracy, they interacted with others outside the conspiracy to vet potential members of the conspiracy and to create tools used by the technically sophisticated members of the conspiracy, and they performed the major technical functions of the conspiracy like creating computer programs to capture videos from live-streaming sites, capturing video files, sorting those captured files, and then uploading files with those programs.

In fact, the discovery showed that even if Mr. Black was one of the early members of the group, Mr. Black was not a leader of the conspiracy. His role became clearer as the investigation of it proceeded, discovery was provided, and the case resolved with his acceptance of responsibility to the government's detailed statement of facts. *Compare* ECF Doc. 18 at 3 (Magistrate's detention order overruling the bond recommendation of pretrial in part on the basis of the government's proffer that the defendant "had a leadership role in the alleged conspiracy") (9/18/23) *with* ECF Doc. 39 at 5 (1/23/24) ("The United States and the defendant will further recommend that to the Court that U.S.S.G. 3B1.1 (Aggravating Role) does not apply).

### III.   **Mr. Black's Background and History**

A.   Reports of the Probation Office and Dr. Sara Boyd

1.   As noted in the PSR, starting from a very young age:

The defendant stated his father was an alcoholic and was at times physically abusive, including requiring the defendant to remove his pants before hitting him with a belt. According to the defendant, his parents' separation was initially very hostile. He recalled being taken back and forth by each of his parents, and one instance in which his father pointed a firearm at him in order to keep his mother from taking him.
    . . .
the defendant was left to take care of himself, including cooking his own meals, caring for himself if he was ill, and cleaning the home. The defendant and his sister indicated their mother turned their home into a "flophouse" where teens and young adults would gather to party, and some would live there for a time. Their house was always filled with people, and his mother would provide them with drugs and alcohol.

The defendant had a lot of interaction with his mother's guests. He did not use drugs or party with them, but he was present when they did so. He recalled seeing people using cocaine on the glass table in their living room and times when the guests would find it comical to watch him drink beer. The defendant recalled becoming intoxicated for the first time around the age of 9 or 10. The defendant stated his mother was very proud of her body and would often walk around wearing lingerie-type clothing. He also recalled some of the boarders and other people who visited his home possessed hardcore pornographic videos and pornographic magazines, and would invite the defendant to view the materials. The defendant stated one of the boarders caught him looking at the magazines when he was 7 or 8 years old.

2.   As noted in the report of Dr. Boyd:[5]

Mr. Black indicated that he thought it was likely that his mother drank alcohol and smoked cigarettes during her pregnancy with Mr. Black.
. . .
Based on Mr. Black's account of his upbringing, it appeared that he experienced significant parentification, that is, he had to take on significantly more adult responsibilities than were appropriate and reasonable for a young child, essentially caring for and supervising himself when his parents were impaired by their reportedly severe substance use disorders. His older sister cared for him when he was

---

[5] *See* Under Seal Exhibit C.

younger, but she was about 10 years older than Mr. Black, so when she left the family home he was left without much supervision or care, by his account. Mr. Black's parents separated but never formally divorced, by his account. The separation created significant chaos and acrimony, according to Mr. Black, and he was "kind of kidnapped back and forth for a while" between his parents. During one such exchange, <u>his father reportedly held a gun to Mr. Black's head.</u> Mr. Black also recalled that his mother, "took [Mr. Black] out of school at one point, sort of hid [Mr. Black] away."

. . .

He reflected that he had good reading comprehension and could often compensate for his limited study habits and lack of structure or routine in his life. I asked Mr. Black what his teachers would likely say about having him in class as a child, and he responded, "I think I stuck out…I'd come in tattered clothes, didn't know how to wash my hands, third or fourth grade I was starting to slip academically…I believe everyone knew that my family was a mess." According to Mr. Black, he did not receive any Special Education services, nor did he repeat any grades. His attendance was generally good, by his account, although at times he missed school when his "parents were fighting over [Mr. Black]. School was a place where [he] could be snatched back and forth."

Notwithstanding this horrific upbringing, Mr. Black worked very hard to exit the world into which he had been born. As documented in the PSR:

After graduating from high school in 1992, Mr. Black attended the University of Maryland, obtaining a bachelors degree in 1996. One year later, he entered law school at George Washington University, obtaining his JD and passing the bar in 2000. Work history included a stable occupational pattern. Mr. Black worked for one firm for more than a decade, then began working for the federal government.

Examining his efforts to address his underlying psychological issues,[6] Dr. Boyd observed:

Trauma history included significant neglect in childhood. Mr. Black also reported that he was exposed to adult sexual behavior and pornography at a young age. He did not go to doctors' appointments or visit the dentist, by his account. He reportedly witnessed domestic violence perpetrated by his father against his mother, and witnessed his mother's sexually

---

[6] During the months between when the allegations came to light and when charges were brought, Mr. Black both saw Dr. Boyd and initiated and underwent sex offender treatment with Tracey Guard, discussed below.

inappropriate behavior toward teenage boys when Mr. Black was an adolescent.

Regarding symptom history, Mr. Black described chronic and pervasive anxiety, as well as low level chronic depression that would be consistent with Persistent Depressive Disorder. He described himself as an "Eeyore," a reference to a famously gloomy, anhedonic, and pessimistic cartoon donkey. Other symptoms included panic attacks, excessive worry, and perfectionism. Mr. Black also reported a history of alcohol use that was consistent with Alcohol Use Disorder. He reportedly was convicted of a driving under the influence charge in 2012, and after that experience he was reportedly vigilant about not driving while intoxicated, but he did not quit drinking. I asked Mr. Black directly if he believed he had a problem with alcohol and he said that he thought he did. His alcohol abuse appeared to be motivated a least in part by a desire to numb painful emotions and as a form of self-destructive, self-punishing, tension reduction behavior. Mr. Black did not report other substance use that would be suggestive of co-occurring substance use disorders.

Mr. Black spoke frankly about his self-described addictive past behavior with respect to pornography use, and he stated that he believed that his pornography use had harmed him in terms of his functioning and his ability to engage in mutually emotionally and physically satisfying relationships. He indicated that he was committed to desisting from all pornography use and other sexual activity online, emphasizing his viewpoint that, "There is no healthy space in my being for pornography [use]." I queried Mr. Black's process of coming to this conclusion, and he indicated that he had come to understand his behavior and the associated harm more clearly once he initiated treatment with Tracey Guard of Old Dominion Counseling, but said he recognized that his pornography use was likely harmful even before he started counseling.

Mr. Black took steps to try to address his sexual misconduct. Before he was charged and arrested, he identified a sex offender treatment specialist to provide his counseling and guidance. His mental health provider Tracey Guard, LPC wrote that:[7]

Mr. Black presents with a great deal of shame, remorse, and difficulty regulating his emotions. Prior to our meeting, he had also seen a Psychiatrist and has been compliant with medication to assist in managing his anxiety around his current legal involvement. Since Mr. Black has taken responsibility and been open to understanding his behaviors, individual sessions have focused on crisis management, taking

---

[7] *See* Under Seal Exhibit D (emphasis added).

accountability with his family and a few close friends, and managing his anxiety, and self-worth. Mr. Black appears to have a substantial history of intergenerational trauma from his family of origin and numerous negative early childhood experiences. Despite, this he has a significant amount of resiliency

. . .

Mr. Black has been fully engaged in the treatment process. He has demonstrated active participation in the group, identified appropriate and realistic treatment goals for himself and brings relevant topics to the group for discussion. Additionally, Mr. Black has completed all written assignments given to him, and requested additional treatment material

. . .

While Mr. Black has only been in treatment a short time, he has shown a genuine interest in furthering his understanding of the factors that led him to offend as well as implementing change in his life to make better decisions in the future

**B.  Mr. Black has Made Many Positive Contributions to the Community[8]**

1.   Ms. Hermon Black

Mr. Black's wife **Hermon Black** is divorcing him.  Nonetheless, for the sake of

her children, she wrote the following letter for the Court's consideration:

We are not only defined by our worst deeds.  I met Mark in 1999. I was impressed with his intellect. I found him to have a wealth of knowledge. Knew right away where this little new country Eritrea was located and the back story. He treated me extremely well.  He embraced my culture [and] even when my parents asked us to have our wedding in Eritrea, he didn't hesitate.

Mark has opened up to me about his childhood trauma. And how much he wanted a normal, peaceful life. He moved as far away and pursued his education. Mark was an outstanding father that wanted to provide nothing but the best from for his kids before they were even born. He prepared our first born son's nursery, painting everything, assembling furniture, shopping for the safest baby gear there was. Read all "what to expect …." books cover to cover. Same thing when we were expecting our second child.

He was a dad that volunteered. Whether it was coaching, score keeping or officiating, he was always there to support and make his kids and teams experience memorable and meaningful.

---

[8] *See* Exhibit E, Character Letters

He was the dad that would scrub the boys baseball pants grass stain. He would work to be an expert in whatever he would do. From gardening to handyman work around the house. Plumbing to electrical.  There is nothing he would not do for his family.

His sons are devastated. He was their go to guy for everything; to joke or to talk current issues mostly sports. Emotionally and psychologically, to say they are hurt would be an enormous understatement. Mark's mission in life was to raise his children to be upstanding, well educated, well rounded and capable people.

They will miss him in many of their milestones, from our youngest son's confirmation and middle school graduation to older son's high school senior year, college application and upcoming graduation and 18th birthday. Their life as they knew was taken away from them suddenly. They face public humiliation and embarrassment.  Their bright existence has been tarnished.

Nonetheless, Mark really was an excellent father and devoted every free hour of his time to either working to support our family, or working to help our children have better lives. I am writing this letter because although I do not expect to have much if any contact with Mark again, I believe it is important for my children to believe and hope that they will be able to see him again in the few years he may have after release.  That they will be able to perhaps have him at a wedding or the birth of a child. I believe this hope is important to them and their development, and I beg you to consider and the generational impact of being able to know they can see their father again outside of prison at least for a few years before he passes.

2.  Ms. Melanie Ramos

His sister **Melanie Ramos** writes that

Mark's childhood was nothing short of abusive. Our maternal grandmother died when Mark was still in a crib. Her passing caused our mother to become very unstable, placing Mark in my room and having me care for him; I was ten years old.  Our father began drinking heavily, likely because he couldn't cope with mom's instability. Dad became an alcoholic and became abusive. At one point when our parents were separating, our father held Mark hostage at gunpoint for two days trying to keep him away from our mother.  These occurrences happened between Mark's first and fifth year of life.

When Mark was six, I moved out and he and mom were left in the home together. Mom was emotionally unstable, mentally void in her ability to

raise a child. Mom went to work leaving Mark alone to fend for himself the majority of the time.  Mom didn't like to be alone, so she started allowing teenage boys come over, enticing them by allowing them to party and keep her company. On a regular basis you would see these teenagers at the house drinking, consuming drugs and watching pornography. This activity was happening on a regular basis with Mark in the home and completely exposed. I left our mother's home when I was 17 years old, Mark was not able to leave; he then had no one to shelter him from the crazy that was his life; Mark was exposed to this lifestyle from the age of six to the age of thirteen. Our mother was not wealthy and Mark experienced times with very little in the way of proper meals, proper care, and what others would consider a proper upbringing. In today's world I can assure you that Mark would have been removed from our mother's home and placed in foster care, but back in that time the law didn't consider a child in danger unless there were obvious physical scars; and no one could see the emotional battle scars that Mark was to conceal.

Mark chose to deal with the cards he was given by becoming an overachiever. Mark excelled in primary school while attending a private catholic school that dad paid for him to attend. He kept his grades very solid and involved himself in sports to stay busy and out of the house as much as possible. When Mark was to graduate from grade to high school, our father came to the graduation. The plan was for Mark to go stay with dad during the summer before beginning high school. It was within a week of his graduation that I got a call. Dad is sick and Mark didn't want to stay with him because he is scared. We quickly found that Dad had terminal cancer. For Mark, even with the past events of dad's behaviors, Mark wanted to be with his father. Dad was hospitalized on May 28th, we were told he was terminal on June 2nd, and he died on June 15th. During that entire time Mark stayed at our father's side every moment that he was allowed. He was trying to heal from the past and gain closure to move forward.

Mark started high school at Strake Jesuit College Preparatory within a month of our father's death. However less than a year into high school, Mom decided to pack up and move to Arizona. Mark was uprooted from everything and everyone he knew and basically had to reinvent his life at that time. Mark immersed himself in school and sports. Mom worked long hours, so again Mark was left to fend for himself. The group of teenagers and negative influences were no longer in the picture. Our father left only a $50k life insurance policy that I agreed Mark could use toward college if he chose to attend. Mark excelled through high school and managed to earn a scholarship.

I had very little contact with Mark once they moved away, but I was made aware of the big things, like Mark completing school and starting college,

then excelling enough to be accepted at a university on the east coast. Mark, through his extreme focus and hard work, was finally able to escape all of the emotional drama and become his own man.

From all outward appearances, Mark was able to overcome all obstacles of the horrendous childhood and he was becoming a wonderful young man. Onlookers could see no demons. Mark came from an early childhood being raised by an unstable mother, an alcoholic father, living in a filthy house, basically being forced to raise himself from the age of five to twelve. He was exposed to drugs, alcohol, porn, losing his father, dealing with his mother's mental instability, and moving away from all other family by the age of thirteen. Mark always seemed to focus on school and find ways to rise above.

Mark completed his four year degree and was accepted into George Washington Law School… a huge achievement! Mark met the woman of his dreams, got married, and purchased their home in less than a year of marriage, He welcomed his first son after the first year of marriage. Mark worked hard and supported his family. When his first son was still an infant they found that his wife had Myasthenia Gravis. Mark jumped into high gear, taking care of his wife, his infant son, still managing his job at a law firm as a young attorney. No matter what was thrown his way, Mark has always been able to rise above and do whatever it took to overcome any adversity thrown his way. Mark and his wife welcomed a second son five years later. Looking at this family through the window, they were as perfect as a family could become.

As a husband of a wife from another country, Mark was always there to assist his wife's family financially. He made it a point to put his nuclear family first, and extend his good fortune to his wife's family. Mark was also there to help my children. He co-signed for my daughter's first auto loan. Mark assisted my son several times as he struggled with his early adult decisions. Mark assisted our mom in getting a loan for her vehicle. For me, my family, and our mother, Mark became "the golden child." Mark was able to face problems head on. Mark became a well-respected man, Mark was what every parent dreamed their own child would become.

Last year our mother fell very ill. Mark was in the middle of a very high profile case with his job and honestly didn't have the time to deal with mom's issues. However as soon as I called him he jumped into action. He flew to Tennessee and met up with our oldest brother. They went to mom's house to find she was living in extremely unhealthy conditions. Mark & Mike had to immediately get mom out of the house and find an alternate place for her to stay. Mark was tasked with getting mom moved; she was living in a home with black mold and was struggling to even breathe. Less than a month later mom was admitted into the hospital and

doctors said she would likely not make it. Mark was assigned as POA and while managing a high profile case at work, he was in constant contact with the doctors, case managers, and siblings to try to best advocate for our mother; the woman that caused such trauma in his childhood. Mark didn't hold a grudge, she is mom and he is son and he was willing to literally go days with no sleep to complete his work, manage next steps for mom, and of course keep up with his children's activities getting them to and from sporting events and school functions.

As Mark's big sister, I can honestly say that my little brother had it all. Success, respect, High position as an attorney, the perfect family life with two very respectful boys that he loved more than life. Mark has always been the over achiever. His life story has been that rare success story from an extremely broken childhood to an extremely successful adult. Mark has always been the person that others turned to for help; financially, emotionally and as a confidant. Mark has, since the age of five, pushed all of his emotional scars as far back as he could so no one would ever know of his suffering. Since he and mom moved to Arizona after our father died, we don't live close to each other, and we both have very busy lives, so I unfortunately must admit I had no idea of Mark's personal demons. I do know that Mark seemed to have overcome so much. I didn't see the hidden scars. I didn't know all the suffering he endured after I left the house when he was only six. I did know he was exposed to the drugs and alcohol from the age of six to thirteen because I witnessed this when I would visit mom's house. I didn't see the pornography during my visits, I didn't know that he was being exposed to hard core porn from the age of six to thirteen. From the outside view I would have never know the demons that have haunted my little brother.

Mark committed a crime, and I believe as does he, that he must pay for that crime. I do not condone what my little brother did in any way. But I feel if he would have had a proper childhood, an upbringing, one that didn't expose him to such extreme chaos and that didn't leave him to deal with life on his own since he was six, if he would have been told that it was acceptable to seek treatment to deal with the trauma he endured as such a young child, he would have made better choices. I understand what he did, and I also understand he stepped away from what he was doing long before the past caught up to him. I know he is now involved in counseling, something that my parents would have deemed as weak to even consider. Please, I understand Mark must pay his debt for his sins, but I would ask that you show some mercy and allow him to one day come out of prison to rebuild, to see his children and maybe even, if time permits, to see his big sister again before I pass. God bless you and thank you for your time.[9]

---

[9] Additional character letters are not quoted but are provided as part of the Exhibit.

C.  <u>Mr. Black is a Low Risk of Recidivism.</u>

At 50 years old with no prior record, Mr. Black has a very low risk of recidivism,

especially upon being given a 15-year sentence.  Dr. Boyd looked at Mr. Black's conduct

and future from a risk assessment perspective. She writes that:

> Mr. Black would likely be compliant with the requirements of community supervision. He appears capable of understanding the requirements and restrictions, of communicating with relevant personnel, of managing his own conduct/behavior, and seeking additional support from mental health professionals if needed. He did not appear to have active compulsions or obsessive behavior related to internet use, or a lack of appreciation for the seriousness of his circumstances. In my opinion, pretrial incarceration would not be supportable from a risk management perspective, and rehabilitation efforts that have already borne fruit would be interrupted. Standard pretrial supervision arrangements would appear to be suitable for Mr. Black, including restrictions and monitoring of any electronic communications, limited access to electronic devices, maintaining abstinence from substance use, attending treatment appointments, and no unsupervised contact with unrelated minors.

> Equally, from a risk assessment perspective, experienced Sex Offender Treatment

Provider Tracey Guard writes:

> When examining an individual's risk to re-offend, both static risk factors and dynamic risk factors are reviewed. Static risk factors are those variables that an individual cannot change. Dynamic risk factors are those variables that the individual can change over time, generally in response to treatment intervention. The third area that is examined is protective factors. Protective factors are strengths that build resilience and can mitigate risk. Mr. Black has numerous factors that are associated with a lower likelihood of negative outcomes. These factors will also assist in the probability of him being successful in treatment. In other words, rather than focusing solely on deficits, Mr. Black has several strengths in the protective domains that should be considered. Mr. Black has the capacity for emotional closeness as demonstrated by his relationship with his wife and sons, he has positive relationships with other law-abiding adults both socially and professionally. He has shown motivation for treatment and has respectful attitudes toward authority. Mr. Black has shown effective problem-solving skills even in the face of crisis, and prior to his legal involvement he maintained consistent employment which he found meaningful.

IV.    <u>Mr. Black's age at the time of release</u>

With a 15-year sentence, Mark Black will be well in his 60s at the time of release. With respect to recidivism, the sentencing commission has noted that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release," and that "[t]he pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased."[10] It noted that "[a]ge and criminal history exerted a strong influence on recidivism. For offenders in Criminal History Category I, [like Mr. Black,] the rearrest rate ranged from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders age 60 or older." And it noted also that "[e]ducation level influenced recidivism across almost all categories . . . among offenders age 60 or older at the time of release, college graduates had a somewhat lower rearrest rate (11.6%) than offenders who did not complete high school (17.2%)."

Further, although the defense is not requesting a departure under this provision, we note that under § 5H1.1, "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."   The Department of Justice itself has established that aging inmates (classified as age 50 or older) are substantially more costly to incarcerate than inmates age 40 and younger:

> We found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than I institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the

---

[10]  Available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders

> highest percentages of aging inmates also spent 14 times more per inmate
> on medication ($684) than institutions with the lowest percentage ($49).

.

Department of Justice, Office of the Inspector General, Report on the Impact of an Aging

Inmate Population on the Federal Bureau of Prisons, at ii (May 2015).

In addition to its financial findings, the investigation also revealed that the BOP

(1) does not have the appropriate level of staff to meet the needs of its aging population,

(2) is not physically equipped to house elderly inmates, and (3) does not provide adequate

programming opportunities for aging inmates. Moreover, the report concluded that aging

inmates commit far less misconduct, have lower risks of recidivism and that, if not for

BOP policy limitations, would be viable candidates for early release from prison. *See id*.

at i-iii.

Finally, and commensurately with the above findings from the investigation, the

United States Sentencing Commission's data reflects that "[t]he life expectancy for a

person in general prison population is 64 years of age. U.S. Sentencing Commission

Preliminary Quarterly Data Report (through June 30, 2012) at A-8.[11]  And a Michigan

study found that for those receiving very lengthy sentences, "Michigan adults

incarcerated for natural life sentences in Michigan, the average life expectancy decreased

to 58.1 years."

The Institute of Health aggregated studies illustrate the impact of lengthy

imprisonment on overall mortality. These studies reflect the existence of what is referred

to as a "hazard rate," which is a linear relationship between incarceration and life

expectancy: for each year lived behind bars, a person can expect to lose two years off

---

[11]available at http://www.ussc.gov/Data,
Statistics/Federal_Sentencing_Statistics/Quarterly_Sentencing_Updates/USSC_2012_3
rd_Quarter_Report.pdf. *See also https://www.lb7.uscourts.gov/documents/17-12441.pdf*

their life expectancy.[12]   A sentence of 15 years for a 50-year-old man constitutes an effective life sentence and may very well be an actual life sentence.   Accordingly, the imposition of a sentence of 15 years of imprisonment is sufficient but not greater than necessary to accomplish the purposes of sentencing.

V. Special Assessment/Restitution

The defense will request at sentencing to continue restitution by 90 days in an effort to resolve these restitution requests.   Half of the requests have been resolved, and counsel hopes to resolve the rest without the need for argument within this additional 90-day window.   With respect to the special assessments, we respectfully request that the Court only impose the $100 special assessment in this case.   Mr. Black does not now have and will not have the employment prospects when eventually released to pay a fine, greater restitution or the costs of incarceration/supervision."   The Court should decline to impose these penalties.

Conclusion

WHEREFORE, for the foregoing reasons, and any others that may appear to the court or that may develop at the sentencing hearing, Mark Black, through counsel, respectfully requests that this Honorable Court sentence him to a term of fifteen years' imprisonment. Mr. Black has already begun severe punishment for his actions.   He lost his career, which he had to overcome tremendous adversity to obtain, and for which he worked so hard, his savings, his home, and his family to which he dedicated the remainder of his life.   When released in his 60s, he will be penniless, jobless, and a

---

[12]      https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7710643/.       *See also* https://news.vanderbilt.edu/2013/02/05/prison-sentence-take-release/("For   every   year actually spent in prison, overall life expectancy decreases *two years*.) (emphasis in original).

registered sex offender with a highly publicized conviction for the facts of this case. Collectively, these consequences, together with a 15-year sentence of imprisonment, takes into account the history and characteristics of Mr. Black and his conduct and is sufficient but not greater than necessary to provide adequate deterrence, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

Respectfully submitted,

Mark Black
By Counsel

_____/s/_____
Cary Citronberg, Va Bar. No 81363
Johnson/Citronberg P.L.L.C.
421 King Street
Alexandria, Virginia 22314
Ph: 703-684-8000
Fax: 703-684-9700
cary@jc-attorney.com

_____/s/_____
Edward J. Ungvarsky, Va Bar. No 83014
Ungvarsky Law, P.L.L.C.
421 King Street, Suite 505
Alexandria, Virginia 22314
Ph: 571-207-9810
Cell: 202-409-2084
Fax: 571-777-9933
ed@ungvarskylaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of April, 2024, I electronically filed a true

copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which

will send a notification of such filing (NEF) to all parties.

                                               /s/

Cary Citronberg, Va Bar. No 81363
Johnson/Citronberg P.L.L.C.
421 King Street
Alexandria, Virginia 22314
Ph: 703-684-8000
Fax: 703-684-9700
cary@jc-attorney.com